MEMORANDUM OF DECISION
By petitions dated June 26, 1995, the Department of Children and Families (DCF) seeks to terminate the parental rights of the mother and fathers of two children, Eden and Joanne. The mother of both children is Ann F. The father of Eden is believed to be Thomas F., who signed a consent form agreeing to the termination CT Page 5256-CCCCC of his parental rights to both children. The consent was accepted by the court after an advisement of rights (Mulcahy, J.). Mr. F. disputed the paternity of Joanne. Mother indicated that Randy M. was the father. Notice to him was provided by newspaper in theManchester Journal Inquirer. This service was confirmed. A default for failure to appear was granted against Randy M. on the first day of trial (July 24, 1996).
The mother, Ann, was born February 27, 1959 in Hartford Connecticut. She was removed from her biological parents at age three months by the Department of Children and Youth Services (DCYS). The reason for her removal from her home was that Ann's mother had been admitted to inpatient psychiatric care. For six years the Department attempted to work with the mother for unification with the child. When they did attempt a reunification, Ann was six and spoke only English, her biological mother spoke Spanish, the reunification failed, and Ann spent the majority of her life in one foster home. Ann's first admission to psychiatric care occurred she was admitted to Norwich State Hospital in 1975, when Ann was 16 years of age. She has been in Norwich Hospital on several occasions; one visit was for more than one year. She has had admissions to Manhattan State Hospital and Bellevue in New York City, as well as several admissions to Cedarcrest Regional Hospital in Newington Connecticut. At Norwich Hospital Ann was diagnosed as having "chronic undifferentiated schizophrenia." Other diagnoses made through the years include bipolar disorder with psychotic features. Ann has a ninth grade education.
While at the Norwich hospital, Ann met and married one Thomas F. in 1982. Little is known of their relationship except that Ann considered him to be involved with cocaine and that he was extremely abusive to her. Her first child, Eden, was born on July 2, 1988. The child was removed from her care by the Department of Children and Youth Services shortly after her birth, due to Ann's psychiatric state. An order of temporary custody was granted on July 15, 1988. The child was adjudicated neglected on September 22, 1989. Eden remained in foster care until she was nearly three years of age. During this time the Department worked with Ann and provided numerous services to her. On June 13, 1991 the Department filed a petition to revoke the commitment. Eden began living with Ann actually since February 1, 1991.
On September 8, 1992, Joanne was born. DCF received four referrals in 1992 regarding mother's conduct with Eden. Before CT Page 5256-DDDDD Joanne's birth, DCF received such a referral on July 16, 1992. The three other referrals made that year were on October 22, 1992; November 2, 1992; and December 21, 1992. The December referral confirmed a report of mother yelling, shaking, and hitting Eden. (Petitioner's Exhibit 5.) Just prior to Joanne's birth, the Manchester police reported on July 16, 1992, that "[t]he mother, Ann F., is a repeated complainant of sexual assault and strange goings on at the home. She claims that Randy M., the father of the child, sneaks in through the window at about 1:30 a.m. and sexually assaults [her]." But, the report stated, she usually sleeps through it. "The condition of the apartment is very slovenly with trash and clutter strewn about. The smoke detector was also deactivated due to the removal of the battery." (Petitioner's Exhibit 4.) In one call to DCF, Ann reported that her boyfriend, Randy M., would break into her apartment with seven men who sexually harassed her and performed witchcraft techniques on her. (Petitioner's Exhibit 8A.)
In March 1993, when Joanne was seven months old, DCF received a referral from the emergency room at Manchester Memorial Hospital that Ann had walked out of the visitor's lounge in the hospital and had left Eden, age four, to care for Joanne, age seven months. (Petitioner's Exhibit 5.) Ann was admitted to the hospital herself on a physician's emergency certificate and DCYS invoked a 96-hour hold on the children. (Petitioner's Exhibit 5.) The children have been in foster care ever since. An adjudication of neglect was made on October 21, 1993. An extension of commitment was granted on March 30, 1995. Eden has lived with her mother two of her eight years. Joanne has lived with her mother for seven months of her nearly four years. The children have been in the same foster home since March 1993.
The petitioner has alleged that the parents, having been found in a prior proceeding to have neglected or failed to provide care for the children, have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the lives of these children. General Statute § 17a-112(b)(2).
The trial commenced on July 24, 1996 and concluded testimony on July 30, 1996. During the course of the trial the court heard the testimony of Janet Romayko, Eden's therapist; Kenneth Crosby, DCF social worker; Dr. David Mantell, who prepared court-ordered psychological evaluations in 1993 and 1995; Dr. Richard B. CT Page 5256-EEEEE Sadler, who prepared court-ordered psychiatric evaluations in 1993 and 1995; Andrea Moran, a primary therapist for Eden at the Natchaug Hospital; Pavinee Saguansataya, a primary therapist in the Natchaug partial hospitalization program; Allison B., the foster parent of the children; Ann F., the biological parent of the children; Dr. Stephen Alloy, the medical director of the Mental Health Clinic at Manchester Memorial Hospital; Bonita M., a neighbor and friend of Ann; Ilda Depina, a social services assistant for DCF who supervised visitation; Carol P., a childhood friend of Ann; and Candace Stone, a social worker who provides case management services to Ann through Horizons, a program for psychiatrically impaired persons to enable them to live in the community.
The threshold issue for the court relates to the sole ground for termination: Has the mother achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, she could assume a responsible position in the lives of these children? The court concludes that she has not.
Virtually all reports reflect the position that Ann loves these children and is highly motivated to have them reunited with her. The reports also suggest that she has reached optimal functioning given her psychiatric condition. While she remains on her rather impressive array of medications, and with numerous support services in place, she is able to meet her own needs. She is unable to meet or appreciate the needs of her daughter Eden. Some comments from two letters of Thomas J. Spudic, Ph.D., who worked with Ann and her two daughters, illustrates the dilemma of the case:
 I have seen considerable progress in mother's ability to stay focused, to speak coherently about her problems, and in her ability to relate to Eden. I am very impressed with her genuine love for these children, and her desire to be with them. She appears to be trying very hard to do the things necessary to regain custody.
 Mother's problems in dealing with the children seem to be exclusively a product of her emotional state/bi-polar disorder. She has difficulty at times staying focused on any given point of conversation, and tends to speak well beyond Eden's capacity to understand. . . . It is clear that she continues to have significant emotional problems. CT Page 5256-FFFFF
 Although Ann has made significant strides in caring for herself, I question her ability at this time to care for her children on a full-time basis. . . . it is far from certain whether she could care for herself and both children — even with considerable support. Respondent's Exhibit 5, dated May 26, 1994 (emphasis in original).
 As you know, I am not optimistic about Eden making it permanently back with her biological mother. Eden is extremely challenging from a behavioral point of view, and mother's ability to set appropriate limits is questionable at best. She tends to set limits and then renege on them, and Eden is very determined and tenacious at getting her own way . . . . She also tends to blame some of Eden's misbehavior on things that she alleges that Eden's biological father did to mother. I seriously doubt that Eden has any real recollection of these events.
 On the other hand, Ann truly has a heart of gold, and very much wishes to have the children returned to her. . . . I sincerely wish her and Eden the best, and hope that I might be proved wrong in my prediction about the outcome of reunification. Respondent's Exhibit 4, dated December 5, 1994.
David M. Mantell, Ph.D. completed his first report on October 18, 1993 (Petitioner's Exhibit 9A). In it, he described Eden's conduct as follows. "The child exhibited poor work product, short attention span, avoidance, resistance, inappropriate affect, oppositionality, pleasure from causing interpersonal distress, and a broad range of socially and emotionally inappropriate behavior." In contrast, "Joanne was only one year of age when seen. Her development seems to be broadly within average limits. She was a pleasant child who posed no difficulties on the evaluation day." With respect to the mother, Ann, Dr. Mantell concluded: "Her general manner of presentation is that of a psychologically simple, anxious, naive, and child-like person with low stress tolerance who is being maintained by medication and substantial support service." (Petitioner's Exhibit 9A.)
Richard B. Sadler, M.D. prepared his first of two psychiatric evaluations on September 26, 1993 (Petitioner's Exhibit 8A). In conclusion he stated:
In my opinion, Mrs. F. has a stable and chronic psychiatric CT Page 5256-GGGGG which has seriously impaired her functional abilities over many years. She has required repeated hospitalizations and supportive outpatient treatment efforts. Mrs. F. is a pleasant socially related, chronically psychiatrically impaired woman who accepts support services and may well be able to be maintained in a supportive and structured setting outside of a hospital. Mrs. F. has not demonstrated an ability to maintain herself in the community without major supports. Her history strongly suggests that Mrs. F. is unlikely to be able to develop parenting skills which have not been demonstrated in the past. No discussion by Mrs. F. indicates an adequate appreciation of the deficits which would need to be corrected in order for her to maintain a stable environment for her children.
In late 1994 and early 1995, DCF worked with other service providers to reunify Eden with her mother. Mr. Crosby, the DCF caseworker, believed that mother had spent more time with Eden, two years, and that if there was any bonding between Ann and her children, it was more likely to be with Eden. Dr. Mantell indicated, "There is no evidence of an ongoing relationship between the mother and Joanne. There is some evidence of a more distant bonding between the mother and Eden with great conflict and dissatisfaction in the relationship, particularly on Eden's side." (Petitioners Exhibit 9B.) Eden was returned to her mother on February 27, 1995.
Difficulties with the reunification quickly appeared. On March 17th at midnight, Ann called the crisis line to report that Eden had been out of control since 2:00 p.m. There was a report of Eden scratching her mother, and an anonymous caller reported hearing Eden cry "Mommy, don't hit me!" That same day Eden was removed from the home. Subsequently Ann indicated that Eden was too difficult for her to manage and therefore she would now like to take her younger child, Joanne. DCF at that time decided to file for a Termination of Parental Rights.
Ann was interviewed a second time by both Dr. Sadler and Dr. Mantell. In her interview with Dr. Sadler on October 4, 1995, Ann said: "They're going for a Termination of Parental Rights. They have a pediatric [sic] exam. I asked to have the younger daughter returned first cause she's easier to handle. I feel now I can give her the extra attention that she needs and I'll be able to relate to her Hypertension [sic] Deficit Disorder." . . . "Eden came back to me totally depressed and violent. I could handle it. CT Page 5256-HHHHH At that time, Joanne's father was harassing me and wouldn't leave me alone. They had keys to the apartment and I was getting raped a lot. I am happy when I see my daughter. I feel a love I cannot describe. I took courses about how to talk to her and how to handle her so she would not get violent and would like to ask her what is bothering her. . . ." (Petitioner's Exhibit 8B.)
Dr. Sadler evaluated Eden's needs as follows: "Eden is, however, a child with multiple difficulties and deficits and who will require much better than average parenting and who will require the interventions of multiple resources to be coordinated over a substantial period of time in order to address the variety of emotional, behavioral, and psychiatric difficulties that have been demonstrated by her over the years. Much better than ordinary parenting will be needed by Eden in order to deal successfully with her handicaps and to capitalize upon her personality, intellectual and physical strengths." (Petitioner's Exhibit 8B.)
With respect to the ability of Ann to parent, Dr. Sadler concluded: "In my opinion, Mrs. F. is not now and is not ever expected to be able to offer minimally adequate or stable parenting for either of her daughters. Mrs. F.'s judgment and her understanding of ordinary reality is impaired to a sufficient degree that her ability to maintain her own stability and functional abilities is severely impaired. Mrs. F. . . . is not capable of parenting any child in a minimally adequate manner. Mrs. F. would necessarily be even more impaired if attempting to manage a behaviorally disordered or a psychiatrically impaired child." (Petitioner's Exhibit 8B.)
In Dr. Mantell's report (Petitioner's Exhibit 9B) is a reference to a PEDAL evaluation at Newington Children's Hospital. This report indicates that Eden is diagnosed with Reactive Attachment Disorder compounded by symptoms of depression, behavioral disturbance, including oppositionality and defiance. It is also noted that she has Attention Deficit and Hyperactivity Disorder and a related learning disability. The PEDAL evaluation recommends permanency planning, including termination of parental rights. The Social Study (Petitioner's Exhibit 12) prepared by DCF, the report of each Dr. Sadler and Dr. Mantell, all recommend the termination of parental rights. These recommendations are also consistent with the letter to Attorney David Stone dated July 3, 1996 from the Joshua Center, a program of the Natchaug Hospital (Respondent's Exhibit 11). The letter opposed a CT Page 5256-IIIII resumption of visitation between Ann and Eden because of "serious concerns about the impact of such a plan on Eden's fragile mental health. . . . Since Eden is extremely fragile, and since, historically, increased contact with biological mother precipitates further regression, resumed visitation would be strongly ill-advised. It would be expected that Eden would further decompensate and possibly require inpatient hospitalization."
Dr . Mantell briefly noted, "This is a sad and tragic case. . . . I would like to believe that there might have been something that could have been done to reverse this process. Regrettably, the mother seems to be tragically disabled by the combination of the psychosocial compromises of her childhood and her chronic mental disorder. The quality of her adjustment at any point is fragile, the risk of decompensation ever present, and her prospects are quite dim." (Petitioner's Exhibit 9B.) Ann is unfortunately a person with a history of disorder, a cross-generational parental failure who is in the identical position as her mother was with her children, and with a serious personality disorder that affects her ability to interrelate with her children.
Accordingly, the court finds by clear and convincing evidence that the parents have not achieved a useful and constructive role as parents; nor, given the needs of the children, especially Eden, is such rehabilitation foreseeable within a reasonable time. General Statutes, § 17a-112 (b)(2); In Re Felicia D.,35 Conn. App. 490 (1994).
As to the putative fathers, Thomas F. has consented to the termination of his parental rights as to both children. Notice has been published as to Randy M. He has failed to appear for trial and failed to rehabilitate himself
The court finds that these grounds have existed over an extended period of time which is greater than one year.
DISPOSITION
It is not sufficient to find that grounds for termination exist. The court must also determine, pursuant to §17a-112(d), if a termination of parental rights is in the best interests of the children. The court must make this finding by clear and convincing evidence. In re Romance M., 30 Conn. App. 839, CT Page 5256-JJJJJ 847-48 (1993), appeal dismissed, 229 Conn. 345 (1994). See also Practice Book § 1050.1(3).
1) The Department of Children and Families has offered appropriate and timely services for transportation for visitation, for psychiatric counseling, for alcohol and drug treatment, and support services such as a parent aide, outpatient psychiatric services through Manchester Memorial Hospital, the Horizons program, the Exchange Club, Genesis, the Village for Families, The Family Support Center, and pastoral counseling.
2) The court finds that the Department of Children and Families has made reasonable efforts given the situation and circumstances to provide counseling for Ann, which she has continuously utilized. Efforts to reunite the child, Eden, with Ann, were made in February 1995. The child was subsequently removed in March 1995. Even the mother agreed that Eden was too difficult for her to control. The Department has unintentionally allowed an inordinate period of time, three and a half years, for Ann to acquire the skills and stability to effectively parent these children. The mother simply does not have the intellectual or emotional wherewithal to raise these two children.
3) Regarding court orders, fulfillment of obligations, expectations and the like: The court finds that court approved expectations have urged Ann to secure and maintain clean, safe and adequate housing, which she has substantially done; to attend visitation sessions as often as permitted, which she has done; and to participate in individual counseling and day treatment, which she has done.
4) The children's feelings and emotional ties with the biological parent and foster parents were fully considered by the the court. The children are clearly bonded to their foster family. The court-appointed psychologist, Dr. Mantell, reports that the foster parents are the psychological parents to the children. There is no parental-child bonding. "There is some evidence of a more distant bonding between mother and Eden with great conflict and dissatisfaction in the relationship, particularly on Eden's side." (Petitioner's Exhibit 9B.) Dr. Mantell notes that the children are compliant with the visitation, while preferring contact with their foster parents whom they view as their psychological parents.
5) With respect to the age of the children, Eden turned eight CT Page 5256-KKKKK on July 2, 1996. Joanne is nearly four years of age. These children require stability in their lives, a time to heal without the fear of having to live with Ann, and an affirmation by this court that they have a permanent home. Leaving these children in legal "limbo" would hardly be in their best interest. A three and a half year delay in bringing finality to this placement decision is inordinately long.
6) With respect to the efforts the parent has made to adjust her circumstances, conduct or conditions to make it in the best interest of the children to return to her home in the foreseeable future, the court finds that Ann has not demonstrated the parenting abilities in the past, and, given her optimal state of her therapeutic gains, she does not demonstrate even now, adequate understanding of Eden's needs or an ability to engage Joanne in any way other than as a playmate. Dr. Sadler indicated that "[i]ncremental gains may well be made over the years, although it is exceedingly unlikely . . . that Mrs. F. will undergo any dramatic or substantial improvement either in her individual functioning or in her parenting abilities." (Petitioner's Exhibit 8B.) Further delay in providing permanency to these children's family structure would be inappropriate.
7) With respect to any barriers which may have reasonably or unreasonably been placed in the path of Ann to prevent a meaningful relationship with the children, the court finds that the Department of Children and Families has met its obligations to Ann by repeatedly offering a variety of services and treatment modalities to her. One of the few consistencies in Ann's life appears to be her consistent willingness to undergo treatment for her mental health problems. She has gone to individual, parental and family support counseling. Notwithstanding the multitude of counseling services in which she has participated, she still lacks the judgment, patience, and skills necessary to parent.
 Mrs. F. has herself consistently and vigorously and successfully continued to engage in behaviors that have maintained the chaos and disruptions in her life. Mrs. F. has selected companions who do not support her parenting and she has demonstrated no improvements in her parenting abilities that would encourage any hope that she will develop parenting abilities in the future that she has never demonstrated in the past. Dr. Sadler's report of October 7, 1995 (Petitioner's Exhibit 8B).
 ORDER
CT Page 5256-LLLLL
Having considered the foregoing facts, it is found by clear and convincing evidence to be in the best interests of Eden and Joanne to terminate the parental rights of their biological parents so that the children may be placed in adoption, or that other permanent planning be accomplished without further delay. It is therefore ordered that the parental rights of Ann F., Thomas F., and Randy M. be and they hereby are terminated. It is further ordered that the Commissioner of Children and Families be appointed the statutory parent for the purpose of placing the children forthwith in adoption and to report to this court in writing as to the progress toward that end no later than ninety days from the date of this judgment. If adoption has not been finalized within six months from the date of the judgment, the Commissioner is further ordered to submit a motion to review a plan for terminated child no later than that date to ensure compliance with federal law which mandates judicial review of every child in the guardianship of this state at least every eighteen months.
APPEAL
The parents have twenty days from the date of this judgment in which to take an appeal. If an appeal is requested and trial counsel is willing to continue representation, this court will appoint such attorney to act as appellate counsel, at public expense if the appellant is indigent, until all appellate process is completed. Practice Book § 4017. If, however, in the exercise of professional judgment as an officer of the Superior Court, the attorney declines to perfect such appeal because, in the attorney's opinion, it lacks merit, such attorney is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of forty days as permitted by law. Practice Book § 4040. Such motions, if unopposed, will be granted ex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, the reason for this opinion shall be promptly submitted to the court in writing. The party seeking the appeal will then be informed by the Court Services officer or the Clerk of the balance of the forty days in which to secure counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. Douglas v.California, 372 U.S. 353 (1963); Fredericks v. Reinke, 152 Conn. 501
CT Page 5256-MMMMM (1964).
Dated at Middletown, Connecticut this fifth day of August, 1996.
Foley, J.